```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3      UNITED STATES OF AMERICA,          )
                                          )
4                  Plaintiff              )
                                          )
5              -VS-                       )  Criminal No. 15-10017-PBS
                                          )  Pages 1 - 26
6      BRANDON COLDWELL,                  )
                                          )
7                  Defendant              )
```

**SENTENCING**

```
10             BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES CHIEF DISTRICT JUDGE
```

A P P E A R A N C E S:

    JORDI de LLANO, ESQ., Assistant United States Attorney,
Office of the United States Attorney, 1 Courthouse Way,
Room 9200, Boston, Massachusetts, 02210, for the Plaintiff.

    JANE F. PEACHY, ESQ., Federal Public Defender Office,
District of Massachusetts, 51 Sleeper Street, 5th Floor,
Boston, Massachusetts, 02210, for the Defendant.

ALSO PRESENT:  Craig Orze, U.S. Probation Office.

```
                              United States District Court
                              1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts  02210
                              November 19, 2015, 4:18 p.m.
```

```
                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
               United States District Court
                1 Courthouse Way, Room 7200
                   Boston, MA  02210
                    (617)345-6787
```

1          P R O C E E D I N G S

2          THE CLERK:  Court calls Criminal Action 15-10017,

3    United States v. Brandon Coldwell.  Could counsel please

4    identify themselves.

5          MR. de LLANO:  Good afternoon, your Honor.  Jordi

6    de Llano on behalf of the United States.

7          THE COURT:  Thank you.

8          MS. PEACHY:  Good afternoon.  Jane Peachy for

9    Mr. Coldwell.

10         MR. ORZE:  And Craig Orze for U.S. Probation.

11         THE COURT:  Thank you.

12         THE CLERK:  You can all be seated.

13         THE COURT:  So I've at this point read the extensive

14   brief and the attachments, Ms. Peachy.

15         You just did, like, a little one-paragrapher, right?

16         MR. de LLANO:  Just to inform the Court as to what we

17   would be recommending today.

18         THE COURT:  All right, so have you reviewed this with

19   your client?  There were no objections to the Presentence

20   Report as it was.

21         MS. PEACHY:  The only objections were factual, and I

22   believe I submitted them late, but when the sentencing was

23   continued, I believe Mr. Orze was able to revise the report

24   again and --

25         THE COURT:  All right.  Well, nothing I need to

1   address, is that right?

2          MS. PEACHY:  No.  They were all factual, your Honor.

3          THE COURT:  All right.  And so at this point, does the

4   government want to say anything?

5          MR. de LLANO:  Well, your Honor, I just --

6          THE COURT:  You're seeking a downward variance from

7   the undisputed range, which is 26, 1 and 1 because he has no

8   criminal history.

9          MR. de LLANO:  Correct.

10          THE COURT:  A Guideline range of 63 to 78 months, one

11   to three years of supervised release, $12,500 to $125,000, and

12   restitution I believe in the amount of $49,330.

13          MR. de LLANO:  Correct.  And from that properly

14   calculated range, we're seeking a downward variance, about

15   20 percent to 15 months, your Honor.

16          THE COURT:  And the basis is?

17          MR. de LLANO:  The basis for that, your Honor, I think

18   was in large part very well laid out by Ms. Peachy in her

19   sentencing memorandum.  The government does take into

20   consideration Mr. Coldwell's lack of criminal history, his age,

21   and the very difficult upbringing and mental condition that

22   resulted.  Ms. Peachy in her memo did reference diminished

23   capacity.  I don't think that that --

24          THE COURT:  You need to speak up just a little bit.

25          MR. de LLANO:  I don't think that this is an example

1    of a departure that's warranted based on diminished capacity

2    because I think that that policy statement as stated in the

3    Guidelines is not applicable here.  However, I do think that

4    based on, you know, the factors that I just articulated, that

5    20 percent departure is warranted.  It's still a significant

6    sentence.  It still reflects the seriousness of this very, very

7    bad offense, or four very bad offenses, and promotes respect

8    for the law, your Honor.

9         Sadly, with regard to deterrence, which I think is

10   another very important 3553(a) factor, I do believe that

11   Mr. Coldwell will be deterred by this, and I think that's

12   exactly what we want with both criminal prosecution and a

13   conviction.  But, more importantly, I think that such a

14   sentence or a stronger sentence, perhaps below the Guidelines

15   but, yes, a stronger sentence, would serve to deter others that

16   are similarly situated, other folks who may be in that position

17   that, you know, one day find themselves lost and in a very

18   difficult situation, and end up in a position where they may

19   have been easily swayed to commit these crimes.  It wasn't just

20   one crime; it was four.

21        THE COURT:  Let me ask you, has any of the restitution

22   been paid?

23        MR. de LLANO:  None of it, to my knowledge, has been

24   paid, no, your Honor.

25        THE COURT:  Have you reached out to the tellers?

1          MR. de LLANO:  The tellers were notified -- or the

2    banks were notified.  The tellers themselves I believe were

3    notified through that notification to the bank.

4          THE COURT:  Because they don't want -- did anyone give

5    a victim impact statement?

6          MR. de LLANO:  I did not receive any victim impact

7    statement, and I believe Probation has accounted that the banks

8    were not --

9          MR. ORZE:  We have not received anything from the

10   banks, yes.

11         THE COURT:  All right, thank you.

12         MR. de LLANO:  Thank you, your Honor.

13         MS. PEACHY:  Thank you, your Honor, and thank you for

14   taking the time to review what I submitted in advance of

15   today's hearings.  When we do sentencing after sentencing in

16   these courts, we talk a lot about -- we churn out these

17   numbers.  We talk about the Guidelines and how they are

18   calculated.  We talk about what other people get for sentences,

19   averages, statistics, things like that.  But in a case like

20   this, what I think it makes sense to do is go back to that

21   overarching principle in 3553(a), and that's to ask yourself

22   what sentence is sufficient but not greater than necessary,

23   which when I think about what that means, it just means, well,

24   what sentence feels right, regardless of what the Guidelines

25   say, what all the numbers say, what sentence feels right.  And

1  after going through everything in Mr. Coldwell's life, looking

2  at all the discovery, the reports in this case, learning about

3  what place he was in at the time of the offense, to me, the

4  sentence that feels right is a sentence of 24 months, followed

5  by the longest period of supervised release that the statute

6  calls for, and that's three years of supervised release where

7  Probation can work with him to make sure he's on the right

8  track.

9       THE COURT:  I kept trying to read from your forensic

10  social worker.

11       MS. PEACHY:  Yes.

12       THE COURT:  It never quite says what his mental

13  illness is.  In the PSR it refers to bipolar, but she

14  doesn't -- is it a she?

15       MS. PEACHY:  She, yes.

16       THE COURT:  She doesn't quite ever say he was

17  suffering from a specific disorder that I know about, and yet I

18  know he was on various medications.  That's the whole problem

19  here:  He wasn't taking them.

20       MS. PEACHY:  Right.

21       THE COURT:  I'm trying to understand that better.  I

22  don't know why she didn't say that.  Is she not qualified to

23  say it?

24       MS. PEACHY:  I think maybe that's part of it is that

25  she's maybe not qualified.  I do know that she did say that it

1   seemed to her that he was suffering from a manic episode at the

2   time of these offenses, that his behavior would be consistent

3   with that kind of episode.

4        THE COURT:  She never quite said it.  It was

5   interesting; I read it a second time through just to see if I

6   could catch it, you know.  I'm just trying to figure out -- the

7   thing that worries me a little bit, okay, so I get it that he's

8   young, he's very young.  I get it that he's got a mental health

9   issue and that he wasn't taking his meds, and over the course

10  of his childhood, both with his adoptive parents and -- he gets

11  violent or certainly doesn't follow rules when he's not on his

12  meds.  So I'm trying to figure out, apart from the punishment

13  piece, how to handle -- should I recommend -- it said

14  somewhere, I read it -- I think it was in her report -- he

15  doesn't want mental health counseling, and I'm saying, "Jeez,

16  that's what he needs."

17       MS. PEACHY:  Yes.

18       THE COURT:  He doesn't want it, he doesn't believe in

19  it, doesn't think he needs it; and that's worrisome because he

20  actually -- and I'll want to hear from you about this -- I

21  mean, that appears to be a consistent problem throughout his

22  life; and while it explains why he did it, it also might make

23  him dangerous without it.

24       MS. PEACHY:  Well, one, we know he's going to be

25  supervised for probation after whatever term of incarceration

1  this Court imposes, and I think that's very important because

2  obviously the Court can order him to do it.  And when he has

3  that type of structure, like what he had at the Perkins School,

4  he does it, and it's not always a smooth road, but he does

5  well.  He ended up graduating second in his class and giving a

6  very impressive graduation speech at his school, your Honor.

7          THE COURT:  Right.

8          MS. PEACHY:  And so I think that if he's supervised by

9  a probation officer, ordered by the Court to undergo mental

10  health treatment, counseling, take any medications that are

11  prescribed, that he will comply.

12          THE COURT:  You know, I read very carefully the report

13  because this obviously now is the moment to do that, and Tim

14  Hammond, the Assistant Director of Programs at Perkins, said

15  that "Brandon has significant mental health issues, and when he

16  was not taking his medications, he could be dark, angry, and

17  labile."  I mean, I underscored that because I think that

18  sounds pretty consistent, right?  That's what happened here.

19  That's what happened in school.  That's what happened with his

20  folks when they got the restraining order.  I'm just trying to

21  grapple with public safety here for a minute.

22          MS. PEACHY:  I understand, your Honor.  I mean, I

23  don't think that mental illness is a reason to punish somebody

24  more severely.  I actually think it's the opposite.

25          THE COURT:  No, it is not a reason to punish someone

1  more severely, but it does raise concerns about public safety,

2  and so I'm trying to understand -- skip the period of

3  incarceration for a minute -- I'll do what I'm going to do on

4  that -- but I'm trying to figure out on supervised release what

5  to do if he thinks he doesn't need mental health treatment and

6  basically the rest of the world does.  Is he on drugs now?  Is

7  he on anything now?

8          MS. PEACHY:  He's not.

9          THE COURT:  Right, I think --

10          MS. PEACHY:  And he's spent pretty much his whole time

11  in Plymouth in segregation.

12          THE COURT:  Why?

13          MS. PEACHY:  I don't know exactly why.  We didn't get

14  records from Plymouth.  You know, I mean, he's not getting any

15  help there, that's the bottom line, and it's not doing him any

16  good.  I don't think it's that unusual, just to step back, also

17  for people with mental illness to have poor insight into that

18  illness, and especially when you're talking about somebody so

19  young, who, as we know, has this tendency to try to act tough

20  to maybe mask some of the things that are going on inside of

21  him.  He has this tendency not to want to admit that he needs

22  help, but Probation, I mean, Probation will bring it to the

23  Court's attention if he's not doing what he's supposed to do on

24  supervised release.

25          THE COURT:  Do you think I should send him to a mental

1   health facility in the Bureau of Prisons?  I noticed he once

2   tried to kill himself?  I only saw one incident like that a

3   long time ago when he was a little boy?

4           MS. PEACHY:  He did it twice, kind of back to back

5   when he was eleven.

6           THE COURT:  Yes, just when he was young, but he's

7   young now still, so --

8           MS. PEACHY:  He is, but he's not -- he's not suicidal.

9           THE COURT:  Okay.

10          MS. PEACHY:  You know, he presents -- I mean, part of

11  the reason why I guess I didn't have him evaluated too, and I

12  think this is also referenced throughout the report, he

13  presents as very charismatic.  He can turn it on, I guess he'd

14  say.  Like, he -- and I don't know if it's some kind of defense

15  mechanism.  I'm not a psychiatrist.  You know, I'm not his

16  therapist, although sometimes I feel that the line gets blurred

17  a little bit, but, you know, he -- you saw it in the graduation

18  speech.  That's kind of what I'm talking about.  He can be very

19  charismatic.  He can present that there's nothing wrong, but

20  looking at --

21          THE COURT:  Do you think he has bipolar?  Is that what

22  we think he has?

23          MR. ORZE:  Your Honor, the records from the Perkins

24  School indicated that.  That's the only information that I

25  really have --

1          MS. PEACHY:  Yes.

2          MR. ORZE:  -- regarding the bipolar.

3          THE COURT:  I think I'm going to do a recommendation

4   for a mental health evaluation in the prison, and, as part of

5   supervised release, mental health treatment and drug treatment.

6   He should also get RDAP, don't you think, because a lot of this

7   has to do with alcohol and drug abuse?

8          MS. PEACHY:  I don't know if it's that severe, his

9   alcohol and drug use.  I think it was a way to self-medicate,

10  honestly, which is again not --

11         THE COURT:  So you don't think RDAP makes sense here?

12         MS. PEACHY:  I mean, I think he was drinking and he

13  was smoking marijuana.  I don't know.  It didn't --

14         THE COURT:  Let me just read it.

15         (Pause.)

16         THE COURT:  "The defendant smoked numerous blunts of

17  marijuana on a daily basis until he was arrested for the

18  instant offense."  He described it, to your point, he describes

19  it as "self-medicating."  Then he did 30 milligrams of Percocet

20  per day on weekends until he was arrested for the instant

21  offense, experimented with other stuff, I guess.

22         MS. PEACHY:  I'm not saying that he wouldn't get some

23  benefit, I think anything, any type of program or treatment

24  that's going to cause him to look inward and deal with things;

25  but I think the root of the problem is mental illness and not

1  addiction.

2        THE COURT:  He says he has no interest in participating

3  in substance abuse treatment.

4        MS. PEACHY:  It's the same thing, your Honor.  You

5  know, I think it's him trying to say, "I don't need anyone's

6  help.  I'm tough," you know.  And teenagers -- I mean, he's not

7  a teenager exactly, but teenagers do that sometimes instead of

8  saying, "I need help, I have problems."  And, I mean, again, I

9  don't think that he wouldn't get any benefit out of substance

10 abuse treatment.  I just think that what the focus should be is

11 mental illness.

12        THE COURT:  Well, if he doesn't want to do it, I can't

13 force it.  I mean, I can force it on supervised release, but I

14 can't force him into the RDAP program, for example.

15        MS. PEACHY:  Right, right, right.

16        THE COURT:  Let me ask you this:  Whatever happened to

17 the money?

18        MS. PEACHY:  Right.  Well, it was never recovered.  I

19 know your Honor asked about -- well, I guess some of it was

20 dropped on the ground, right?

21        MR. de LLANO:  I can speak to that.

22        THE COURT:  $40,000 or something?

23        MR. de LLANO:  No.  $49,330 is what was actually

24 taken, and that was out of three bank robberies.  The fourth

25 one, a dye pack had exploded, and all of what was taken that

1  day was recovered.  So out of the $49,330, based on statements

2  made by Mr. Coldwell after during an interview with agents, my

3  understanding is, he gave that money to other individuals and

4  he spent that money.  He spent that money on clothes and

5  necessities because I understand he was homeless.

6           THE COURT:  So it's not left, so he's going to have to

7  be starting from scratch when he gets out.

8           MR. de LLANO:  Starting from scratch, yes, my

9  understanding.

10          MS. PEACHY:  I mean, your Honor asked about whether

11 restitution has been paid.  I mean, he has nothing.  I mean, I

12 wouldn't put that burden on his parents.

13          THE COURT:  Well, I'm not going to put it on his

14 parents.  I'm going to put it on him.

15          MS. PEACHY:  Right.  And, I mean, hopefully when he's

16 released -- I know his parents were -- when we had asked your

17 Honor to consider his release presentencing for the Rise

18 Program, his parents were willing to take him back in, with the

19 understanding that he would be supervised and he'd have to

20 follow certain conditions.  I think when he's released from

21 this period of incarceration, that would be where he would go,

22 at least initially, until he can find employment.  He is

23 employable, although, you know, the fact of a felony conviction

24 is certainly going to make that more difficult.

25          THE COURT:  I'm actually told that housing is harder

1    than employment these days.  People are willing to give you a

2    chance in employment, but the housing is brutal because it's so

3    expensive, really, more than anything.  So if he has a house to

4    go to, that goes a long way.

5          MS. PEACHY:  He does, and he has potential is what I'm

6    getting at, I guess.  You know, we know he ended up doing very

7    well at the Perkins School.  He has had jobs where he was

8    valued and did well.  I'm thinking in particular of the job he

9    had selling cars for Bernardi Honda.  They really liked him and

10   he did well there, and that's probably because of his

11   charismatic personality.  But, you know, he's so young and at

12   such a critical age and has so many needs and vulnerabilities,

13   your Honor, that we really -- this is a unique case in a way

14   because I think it could really change the course of his life.

15   I mean, not to get too dramatic, but I really feel that way,

16   that the course of his life could change one way or another.

17         THE COURT:  All right, thank you.  Does he want to say

18   anything?

19         MS. PEACHY:  Yes, your Honor.

20         THE DEFENDANT:  How are you doing today?

21         THE COURT:  Good.

22         THE DEFENDANT:  I had wrote this, but I just -- since

23   you guys have been talking, I have listened to some of the

24   stuff you guys have said.  You guys think I'm a dark, gloomy

25   person, but I'm not a bad person.  I don't consider myself a

 1    bad person.  I know what I did was wrong.  I know how severe it

 2    is.  I know also what I'm capable of.  Like she said, I've

 3    worked.  I mean, like, to give you some insight on when I

 4    worked at Honda, I was walking to work, like, a good ways to go

 5    to work.  And it seems like every time I try to work, something

 6    would come up.  And it's just, I never intended my life -- I

 7    know I'm better than this, is kind of what I'm trying to say.

 8    I'm not -- I don't look at myself as this type of person that

 9    sits in courtrooms and listens to how bad I've been doing.  I'm

10    embarrassed by this.

11           THE COURT:  Well, can I ask you, can I jump in and

12    say, so I think your attorney argues, and it's supported by the

13    record, that a lot of this is stemming from mental health

14    issues; and certainly it's consistent in your record, which

15    I've spent a lot of time reading about you.  What do you think

16    about that?  Do you need help?

17           THE DEFENDANT:  Yeah.  I -- I think my biggest thing

18    is I've, like, I got -- I got mental issues and I got just

19    normal stuff where I have to grow up, to be honest.  That's

20    honestly how I've looked at it, and since I've been

21    incarcerated, I've really realized that.  It's crazy to say,

22    like, I sit down and I talk to people and they tell me -- it's

23    harder when your friend tells -- I think you learn more about

24    yourself when your friend tells you something about you that

25    you're doing, and then you sit back and you get to actually sit

1    there and look at it and try to change it.  I do believe I got

2    mental stuff that I have to deal with.

3              THE COURT:  Do you want mental health counseling in

4    the prison or on supervised release?

5              THE DEFENDANT:  Yeah, like, but it's, like, I don't

6    want you guys to think that I'm, like, suicidal and all because

7    I'm not.

8              THE COURT:  No.  That was a long time ago when you

9    were a little boy.

10             THE DEFENDANT:  Yeah.

11             THE COURT:  Let me ask you this:  I've seen bipolar

12   disorder listed.  Have you heard that evaluation before?

13             THE DEFENDANT:  Yeah.

14             THE COURT:  And do you think it makes sense for you to

15   take medication so that you don't go on these manic bank robber

16   sprees?

17             THE DEFENDANT:  Yeah, absolutely.

18             THE COURT:  I mean, I think you should be evaluated

19   for that.

20             THE DEFENDANT:  Yeah.

21             THE COURT:  And what about -- I know everyone is

22   talking about legalizing marijuana and all that, but smoking a

23   lot of blunts a day makes you dysfunctional, and it's

24   expensive.

25             THE DEFENDANT:  Yeah.  I think -- I think during the

1    period of time when I was doing that, it was -- it was more I

2    wasn't working.  Like, when I work, I don't really smoke like

3    that.  Like, people will tell you I'm a completely different

4    person, I really am.  I go -- maybe it's my bipolar; maybe it's

5    the depression.  I don't know.  I don't really know, but I know

6    when I'm working and I'm doing what I have to do, I am not the

7    same person I was when I was doing this.  You know what I mean?

8    And what ended up happening with me is, it's like I got -- I

9    feel like it's on me because I made the decision to do what I

10   did.  I'll never -- I'll never downplay that, that I made those

11   decisions, I caused this on myself, but --

12           THE COURT:  What's going to put you in a position that

13   you can withstand it when other people sort of goad you into

14   doing things, which I guess is sort of what happened here, and

15   in other situations as well?

16           THE DEFENDANT:  I feel like --

17           THE COURT:  What's going to help you withstand that

18   because it's going to happen again?

19           THE DEFENDANT:  This right here is going to help me,

20   to be honest, because I'm not trying to go through this again.

21   I feel like I've let a lot of people down by being here, and

22   that me as a person, I know I should be better than this.  I

23   don't know how else to put it.  Like, I don't think any

24   medication, like, can show me -- like, obviously it might help

25   with my decision-making, but at the end of the day, I think it

1    comes down on me to realize.  Before I just -- I just -- I

2    couldn't identify with something like this.

3           THE COURT:  Well, as I always say to people, the bad

4    news is, you're standing here, but the good news is, the

5    federal government has lots of resources and wants you to

6    succeed and not recidivate, so I think mental health treatment

7    and drug treatment seems appropriate.

8           THE DEFENDANT:  It is.

9           THE COURT:  And you need to work to pay back this

10   money.  That's your obligation to do that by law.  Do you

11   understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And what happened in prison?  Why are you

14   in segregation?  What happened?

15          THE DEFENDANT:  I just -- every three or four months

16   is a good chance to change the scenery, to be honest.

17          THE COURT:  What?

18          THE DEFENDANT:  Like, because you sit on the -- I

19   don't know how to explain it really.  Like, it's like sitting

20   in the same room --

21          THE COURT:  Was someone threatening you?

22          THE DEFENDANT:  No, no.  I just, like, every three or

23   four months, I'll go to the hole, and then I'll go back to --

24   because you go to different units when you leave the hole.

25          THE COURT:  But you usually have to do something to go

1  to the hole.

2      THE DEFENDANT:  Refusing housing.  I -- I've been in

3  fights while I've been incarcerated.  Like, it's like a

4  multitude of things.  It really just depends on -- it depends

5  on whatever.  You know what I mean?  But it's not -- I don't

6  know.  I feel like, after a little while, I need a change of

7  scenery, and that's usually, like, whether it's saying --

8  because you can refuse housing and go down to the hole

9  peacefully.  There's a lot of different ways to have to go

10  to seg.

11      THE COURT:  And your parents are here for you.

12  They've been here for you for everything.  Do you want to say

13  anything to them?

14      THE DEFENDANT:  Sorry.

15      THE COURT:  I mean, they obviously love you, and

16  that's a big plus.  Do you know how many people stand here who

17  have nobody sitting back there for them?

18      THE DEFENDANT:  I can't imagine.

19      THE COURT:  I'm sure your lawyer can tell you how many

20  people here who have no one, and I read about the love, that

21  they care for you and -- what is it, your sisters?

22      THE DEFENDANT:  Yes.

23      THE COURT:  -- and other people, other children as

24  well.  So I certainly appreciate.  I think one of the biggest

25  hopes for you to come out the other end of this is the fact

1    that they're here and have been there for you despite some

2    rough patches.

3         Do either of the parents want to say anything to me

4    about what you -- you can be seated -- what you think is needed

5    here?  You know him better than I do.

6         MRS. COLDWELL:  I agree that Brandon is a wonderful

7    person.  He owns to what he did, and I think that is a great

8    thing, a strength of his to own to what he did.  But I also

9    think that he's always been in denial about his mental health.

10   And, you know, he doesn't think that he needs these meds, and

11   so sometimes when he's having a good, you know, a good, uhm,

12   month or two months or three months that he accepts his

13   medicines, he sees how well he can perform, how wonderful he

14   works.  He's very talented.  He has a lot of potential to get a

15   college education and be somebody, you know, successful.  And

16   we just -- I love him, and, you know, Brandon needs to accept

17   himself.

18        THE COURT:  Thank you.  Thank you very much.

19        So this is what I'm going to do:  I have to consider

20   the statutory factors after I've calculated the Sentencing

21   Guidelines, and I first start off with the nature and

22   seriousness of the offense, offenses, I should say.  These are

23   extremely serious crimes.  I mean, as much as we're sympathetic

24   to the mental health issues, you robbed four banks; you

25   threatened people with a gun, even though you didn't actually

1    have one, as far as I can tell.  You scared people.  Think how

2    scary it was to be in those banks as a teller when someone

3    says, "Give me this money, I've got a gun."  We've since found

4    out that people talked you into it, but the reality is, you're

5    the one who did it, and not once but four times.  That's really

6    serious.

7          The second thing I would say is, you didn't pay back

8    the money.  So at some level, when I think about remorse, I

9    think about, "Where's the money?  Pay back the victims."  And

10   that never happened, and my guess is, it will be difficult to

11   have that happen.  So I think those two things are extremely

12   serious and deserve a period of incarceration.

13         I also understand, though, I have to take into account

14   who you are as a person, your nature and characteristics, and

15   you're young.  I think everyone agrees you're young.  You

16   yourself agree you're young.  And you've got two big issues, as

17   far as I can tell, two huge issues.  One is a mental health

18   issue, and it worries me that you haven't totally owned up to

19   it.  It may well be bipolar, it may be some other syndromes

20   that they mentioned in the reports, but it's quite clear that

21   you have been given meds and you don't take them.  And what

22   worries me is, you know -- that's why I asked, why were you in

23   the hole? -- you were in fights.  You're not taking any meds

24   right now.  I mean, I don't know what you're like when you're

25   not on your medications.  Most of the people I see aren't in

1    and out of the hole.  So I worry about that.

2         And the other thing is the whole issue of smoking a

3    lot of marijuana.  And I understand you say alcohol is behind

4    you.  I'll take your word for that.  But smoking multiple

5    blunts a day makes you dysfunctional, and it won't be permitted

6    on supervised release.  So regardless of what the laws of the

7    state of Massachusetts are, it's interfering with your ability

8    to function.  And it may be self-medication, but rather than

9    using pot, you're going to be on medications.

10        As I mentioned, I've taken into account the

11   Guidelines.  The government has moved for a variance I think

12   primarily based, my guess is, on your age.  And I'm going to

13   add to age, I'm going to add first-time offender and add the

14   fact of mental health.

15        I'm going to impose a term of incarceration of three

16   years.  I am going to impose three years of supervised release.

17   Is that what it is, the maximum amount?

18        MR. ORZE:  Yes, your Honor.

19        THE COURT:  I'm going to impose that during that he

20   have drug treatment, alcohol treatment, though that sounds like

21   it's moved more from alcohol to drugs; and most importantly of

22   all, mental health treatment, and that he should go to a mental

23   health, and that I'm going to require that he take the

24   medications as prescribed.  I'm going to recommend that when

25   you go into the institution, that you get mental health

1   evaluation and mental health treatment.  That may be Fort -- I

2   don't know what they're going to do with that.  I'm going to

3   recommend Fort Devens.  I don't know if they'll stick with

4   that, but at least it will be near your parents who love you,

5   who actually live quite near because you're out in Upton, is

6   that it?  That's out near Fort Devens, right, in Ayer?  Yes.

7   So I'm going to recommend that, but I have no power to make

8   that happen, so they can come visit.  They obviously care about

9   you.  If not, someplace as close as possible to Massachusetts

10  so that they can visit.  There's a place in New Hampshire now

11  and one in upper state New York, but I'm going to recommend

12  mental health treatment.

13          And I don't think I can recommend RDAP because he

14  doesn't want it and you haven't requested it.  I don't know if

15  that's critical for marijuana.  What do you think?  I mean, if

16  he doesn't want it, I --

17          MR. ORZE:  Your Honor, we didn't put the RDAP section

18  into the report because we felt, since he didn't express

19  interest and he was primarily smoking marijuana.

20          THE COURT:  Okay, then I won't recommend that.  I

21  obviously have to impose, what's it, $400 special assessment?

22          MR. de LLANO:  $400.

23          THE COURT:  And you have to pay back the restitution,

24  so I'll require that you get a job.  There's no doubt in my

25  mind you will be able to get a job.  The question is holding

1  it.  That was of concern, that you kept losing your jobs.  Now,

2  some of that seemed to be because you were far away from the

3  place you worked, but, still, you've really not held a job for

4  a long period of time ever, so you need to work at holding a

5  job.

6  So no interest on the restitution, I'm reminded, and I

7  think at this point I'll -- I'm varying, to be clear, on

8  grounds of age, first-time offender, mental health.

9  MS. PEACHY:  Your Honor, I know you said you would

10  impose a condition that he work, which I support, but I also --

11  if he's attending school full time, I would -- I don't know,

12  maybe that's what he wants to do instead.  Maybe he wants to go

13  to college.  I mean, I think he does want to go to college, but

14  if he's attending school full time --

15  THE COURT:  He also needs to pay back that

16  restitution.  I tell you what, if he gets into a school full

17  time, move to modify that condition of release.  He's not paid

18  back any of it, so I don't know where it is.  He's got to pay

19  that back.  That's going to be a lifetime obligation.  And we

20  want you to succeed.  We don't want you to fail.  But if you're

21  living at home or in another facility, you know, maybe some

22  sort of housing of some sort, you need to at least pay a

23  portion of that back into restitution.  I don't know if you

24  know of anyone -- well, let me put it this way:  I'm not going

25  to ask you because I don't want to get in the middle of you and

1    the attorney-client, but if there's a place where that money

2    is, it will help you not be burdened by that debt when you get

3    out.  But there's nothing I can do about that.  The standard

4    conditions of release.

5         MR. ORZE:  Your Honor, the financial conditions, do

6    you want those applied also?

7         THE COURT:  Yes, because he needs to work.

8         Let me say this to you:  There are many standard

9    conditions, but the two things I want to be specific about is,

10   you cannot smoke marijuana.  It shows up in your urine tests.

11   The maximum amount of testing.  You can't smoke it.  And that's

12   what most of my people on supervised release get tripped up on

13   because they say, "Oh, Massachusetts, that's not a problem."

14   It is a problem.

15        And the second thing is, I mean, I understand that

16   you're a young man, you may not want to live with your folks,

17   but at this point you're a felon, and if you get involved with

18   any kind of firearm, it creates a big problem for you, so stay

19   away from that.  I mean, one of the big blessings here is that

20   you actually didn't have a gun.  So anything else anyone can

21   think of at this point other than the notice of appeal rights?

22        MR. de LLANO:  Nothing, your Honor.

23        THE COURT:  All right, thank you.

24        MS. PEACHY:  No, thank you.

25        THE CLERK:  Can you please stand so I can read the

1    notice of appeal.  The Court hereby notifies you of your right

2    to appeal this sentence.  If you cannot afford the cost of an

3    appeal, you may move to proceed in forma pauperis.  Any appeal

4    from this sentence must be filed within fourteen days of entry

5    of judgment on the docket.

6              Do you understand these rights?

7              THE DEFENDANT:  Yes.

8              THE COURT:  All right, I wish you the best of luck,

9    and I hope I don't see you again.  I don't want you to be one

10   of these people who comes out, and then I end up having to have

11   a revocation procedure.  Good luck.

12             THE DEFENDANT:  Thank you.

13             MS. PEACHY:  Thank you, your Honor.

14             MR. de LLANO:  Thank you, your Honor.

15             THE CLERK:  All rise.

16             (Adjourned, 4:52 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 26 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Criminal No. 15-10017-PBS,

11 United States of America v. Brandon Coldwell, and thereafter by

12 me reduced to typewriting and is a true and accurate record of

13 the proceedings.

14      Dated this 18th day of May, 2016.

15

16

17

18

19

                   /s/ Lee A. Marzilli
20                 _____

                   LEE A. MARZILLI, CRR
21                 OFFICIAL COURT REPORTER

22

23

24

25